# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td></td><td>100 EAST FIFTH STREET, ROOM 540</td><td></td></tr>
<tr><td>Deborah S. Hunt</td><td>POTTER STEWART U.S. COURTHOUSE</td><td>Tel. (513) 564-7000</td></tr>
<tr><td>Clerk</td><td>CINCINNATI, OHIO 45202-3988</td><td>www.ca6.uscourts.gov</td></tr>
</table>

Filed: January 04, 2023

Mr. Justin Scott Gilbert
Gilbert Law
100 W. Martin Luther King Boulevard
Suite 501
Chattanooga, TN 37402

Ms. Jessica Grace Ann Jernigan-Johnson
Ms. Amanda Lynn Morse
Knox County Law Director's Office
400 Main Street
Suite 612
Knoxville, TN 37902

Ms. Jessica Farriis Salonus
Salonus Firm
139 Stonebridge Boulevard
Jackson, TN 38305

Re:  Case No. 22-5317*, Jane Doe v. Knox County, TN Bd Education*
     Originating Case No. : 3:22-cv-00063

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Deborah S. Hunt, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Ms. LeAnna Wilson

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0002p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

────────────────

JANE DOE, a student, by her next friends and parents, K.M. and A.M.,

*Plaintiff-Appellant,*

*v.*

KNOX COUNTY BOARD OF EDUCATION,

*Defendant-Appellee.*

No. 22-5317

────────────────

Appeal from the United States District Court for the Eastern District of Tennessee at Knoxville.
No. 3:22-cv-00063—Katherine A. Crytzer, District Judge.

Argued: October 25, 2022

Decided and Filed: January 4, 2023

Before: SUTTON, Chief Judge; DONALD and MURPHY, Circuit Judges.

────────────────

### COUNSEL

**ARGUED:** Justin S. Gilbert, GILBERT LAW, PLC, Chattanooga, Tennessee, for Appellant. Amanda Lynn Morse, KNOX COUNTY LAW DIRECTOR'S OFFICE, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Justin S. Gilbert, GILBERT LAW, PLC, Chattanooga, Tennessee, Jessica F. Salonus, THE SALONUS FIRM, PLC, Jackson, Tennessee, for Appellant. Amanda Lynn Morse, Jessica Jernigan-Johnson, KNOX COUNTY LAW DIRECTOR'S OFFICE, Knoxville, Tennessee, for Appellee.

────────────────

### OPINION

────────────────

MURPHY, Circuit Judge. Jane Doe, a high-school student, suffers from a condition that makes her hypersensitive to the everyday sounds of eating food and chewing gum.

No. 22-5317                    *Doe v. Knox Cnty. Bd of Educ.*                    Page 2

Doe's parents asked her school to ban students from eating or chewing in her classes. It refused. So they sought this ban by suing the Knox County Board of Education under the Americans with Disabilities Act (ADA) and the Rehabilitation Act. While considering their preliminary-injunction motion, the district court decided to dismiss the suit. It reasoned that Doe's parents could obtain the requested relief in administrative proceedings under the Individuals with Disabilities Education Act (IDEA). Until they exhaust this administrative process, the IDEA bars Doe's parents from using the ADA or Rehabilitation Act to seek "relief that is also available" under that law. 20 U.S.C. § 1415(l). Doe's parents now argue both that they need not exhaust their claims under the IDEA and that we should grant Doe a preliminary injunction under the ADA and Rehabilitation Act on appeal.

We agree with their first argument but not their second. The IDEA provides relief only to students who need "specially designed instruction." Because no ordinary English speaker would describe a ban on eating and chewing as "instruction," her parents did not need to go through the IDEA's review process to attempt to seek this ban under the ADA and Rehabilitation Act. But just because Doe's parents need not exhaust their claims does not mean that Doe is entitled to a preliminary injunction under those laws. Knox County has offered significant justification for its policy allowing students to eat in class at the magnet school that Doe chose to attend—a school designed to operate like a college. Ultimately, though, we leave this issue for the district court to consider in the first instance. We thus reverse the district court's dismissal of the complaint, reject Doe's request that we grant a preliminary injunction, and remand for further proceedings.

I

This case reaches us at the motion-to-dismiss stage. We thus must accept the complaint's well-pleaded factual allegations as true. *See Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 543–44 (6th Cir. 2021); *Mattox v. Edelman*, 851 F.3d 583, 590 (6th Cir. 2017).

Jane Doe, who lives with her parents near Knoxville, Tennessee, has a condition known as "misophonia." Compl., R.27, PageID 251. The complaint describes misophonia as "a disorder of decreased tolerance to specific sounds or their associated stimuli." *Id.* According to

Doe, the normal sounds of eating food or chewing gum cause her to suffer "great fear and anxiety." *Id.*, PageID 252. These common noises trigger a "fight or flight" sensation, forcing Doe to escape from areas in which she hears them. *Id.* They also exacerbate her recurring migraines. *Id.*

Before high school, Doe's misophonia did not affect her academic performance. *Id.*, PageID 255. Her private middle school barred students from eating food and chewing gum in classrooms. *Id.* She thus could attend class without incident and excelled at her academics. *Id.*, PageID 253–54. Doe was a "straight A student" and National Junior Honors Society member. *Id.*, 253, 255; Doe Decl., R.27-2, PageID 265.

According to Doe's complaint, most of Knox County's public high schools likewise bar students from eating food and chewing gum outside the cafeteria. Compl., R.27, PageID 255. Yet Doe decided to attend L&N STEM Academy. *Id.*, PageID 250. This high school's policy allegedly allows each teacher to decide whether students may eat food and chew gum on a class-by-class basis. *Id.*, PageID 255–56. Some teachers, like Doe's ninth-grade math teacher, prohibit food and gum, so she has flourished in this class. *Id.*, PageID 256. The high school also prohibits eating food or chewing gum in areas with "expensive equipment," such as digital-art classrooms. Doe Decl., R.27-2, PageID 266. But other teachers, like Doe's ninth-grade history teacher, allegedly allow "rampant" eating and chewing. Compl., R.27, PageID 256. The high school also allows students to eat throughout an 80-minute elective ("Genius Hour") that Doe would like to take. *Id.*, PageID 257. L&N's permissive policies have forced Doe to avoid this elective and to leave her regular classes about 50% of the time, rendering her "physically and emotionally exhausted" at day's end. *Id.*, PageID 256.

Doe's parents repeatedly asked Doe's teachers to ban eating and chewing during her classes. *Id.* But some teachers allegedly have refused on the ground that L&N's official policy permits this conduct. *Id.*, PageID 257. Doe's parents thus turned to the school's administrators, asking them for this accommodation about halfway through her ninth-grade year in December 2021. *Id.* The administrators denied the request. *Id.*, PageID 258–59. But they noted that Doe's parents could appeal this decision administratively. *Id.*, PageID 259 n.8.

The next month, her parents instead brought this suit on Doe's behalf against Knox County. They alleged that the county's refusal to grant Doe the requested accommodation—a classroom ban on eating and chewing for all students except those with medical needs—violated the ADA and Rehabilitation Act. *Id.*, PageID 255, 259–60. They requested a permanent injunction that would require L&N to implement the accommodation for Doe. *Id.*, PageID 260–61.

Along with their complaint, Doe's parents filed a motion for a preliminary injunction. During the injunction briefing, Knox County explained its rationale for refusing to ban eating and chewing in Doe's classrooms. L&N, a public "magnet" school, offers a curriculum tailored to the study of science, technology, engineering, and math for over 500 students from nine counties in and around Knoxville. Allen Decl., R.44-1, PageID 445–46, 448. Students must apply to attend this school and maintain certain standards to stay there. *Id.*, PageID 449. According to L&N's principal, the school seeks to develop a "unique" culture that gives the students more independence than a typical high school and allows their teachers to develop "individualized teaching methods" for them. *Id.*, PageID 449. Because L&N operates more like a college, it has gathering spaces that can hold only 70 to 90 students and lacks a designated "cafeteria." *Id.*, PageID 447. L&N also has only two scheduled lunch periods during the school day because of the nature of its curriculum. *Id.* If students could eat only at specified times, the school would have to change its "entire schedule[.]" *Id.* Some students also travel from hours away to attend L&N and stay for extracurricular activities. *Id.*, PageID 448. They may remain on campus for over 12 hours and often need to eat more than at a designated lunch time. *Id.* The school thus allows teachers to permit snacking during class. *Id.*, PageID 447.

Knox County also described the accommodations that L&N had provided to Doe. Since her arrival at the school as a ninth grader, Doe has had a "504 plan" (a plan under § 504 of the Rehabilitation Act). Odom Decl., R.44-2, PageID 451. Among other things, this plan gives Doe preferential seating near the teacher and allows her to wear noise-cancelling headphones. *Id.* It also gives her additional time to complete assignments and permits her to take tests in isolation. *Id.* Under a "'break' system" that administrators developed with Doe's parents, moreover, she could signal to a teacher that she needed a break of a specified length and obtain a

new seat on her return to class.  *Id.*  But administrators allege that Doe stopped using this "collaborative" system and started leaving class without attempting to return.  *Id.*, PageID 452.

According to L&N's principal, Doe's teachers have all requested that her peers limit eating in class.  Allen Decl., R.44-1, PageID 446.  But Doe responds that her case has now attracted unwanted local attention.  The Knox County mayor, a retired professional wrestler who competed under the moniker "Kane," has described the suit as "gum gate" on Twitter.  Br., R.15, PageID 168.  (The mayor has no affiliation with the Knox County Board of Education.)  According to her father, this attention has caused some cruel students to target Doe by making noises that trigger her condition.  K.M. Decl., R.31-1, PageID 359.

When considering Doe's preliminary-injunction request, the district court flagged a "potential jurisdictional issue" for supplemental briefing: Did Doe's parents need to seek relief for Doe's injuries under the IDEA's administrative process before they pursued their claims under the ADA and Rehabilitation Act?  *Doe v. Knox Cnty. Bd. of Educ.*, 2022 WL 1126389, at *2 (E.D. Tenn. Apr. 15, 2022).  During that briefing, Knox County moved to dismiss the complaint on this exhaustion ground.  The district court granted its motion.  *Id.* at *1.  It held that Doe's parents sought relief for an educational harm that the IDEA could remedy.  *Id.* at *4.

Doe's parents filed a notice of appeal and sought an emergency injunction pending appeal.  The district court denied her request for an immediate injunction, and we subsequently denied that request too.

## II

Doe's parents raise two arguments on appeal.  They argue that they did not seek IDEA-available relief and so did not need to exhaust its administrative process before litigating their ADA and Rehabilitation Act claims.  They argue further that we should grant Doe a preliminary injunction because they likely will succeed on these claims.

### A.  Exhaustion under the IDEA

The IDEA's exhaustion requirement grew out of the reality that three laws potentially allow children with disabilities to seek relief for difficulties that they encounter at school: the

No. 22-5317                          *Doe v. Knox Cnty. Bd of Educ.*                          Page 6

ADA, the Rehabilitation Act, and the IDEA. *See Fry ex rel. E.F. v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 748–50 (2017). The first two laws protect all individuals with disabilities. Title II of the ADA seeks to ensure that people with disabilities may use public facilities like libraries, courthouses, or schools. It provides: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Rehabilitation Act imposes a similar mandate on "any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). These laws permit individuals to sue for damages or an injunction if a defendant violates their requirements. *See id.* § 794a(a); 42 U.S.C. § 12133.

The IDEA, by contrast, protects only children with disabilities. It requires a state that wants IDEA-related funding to make "[a] free appropriate public education" "available to all children with disabilities residing in the State between the ages of 3 and 21[.]" 20 U.S.C. § 1412(a)(1)(A). To deliver the required education to a qualifying child, school officials and parents must cooperatively develop an "individualized education program" unique to the child (what Congress itself shortened to the acronym "IEP" in the law's text). *Id.* § 1414(d)(1)(A). If parents believe that their child's IEP falls short of providing a "free appropriate public education," they may raise their concerns in an administrative complaint, proceed through an administrative hearing, and appeal to a state educational agency. *See id.* § 1415(b)(6), (f)–(g). Under the IDEA, parents may turn to the courts only after seeking relief through this process. *See id.* § 1415(i)(2)(A).

Parents have sometimes sought to avoid the IDEA's administrative scheme by immediately suing for an inadequate education under the ADA or Rehabilitation Act. The Supreme Court initially responded to this attempted workaround by holding that parents could seek relief only under the IDEA when challenging the adequacy of a child's education. *Fry*, 137 S. Ct. at 750 (discussing *Smith v. Robinson*, 468 U.S. 992 (1984)). Finding the Court's response overbroad, Congress amended the IDEA by adding its exhaustion requirement. *See id.* The IDEA now allows parents to pursue overlapping claims under the ADA or Rehabilitation Act,

but they must complete the IDEA's administrative process if they are "seeking relief that is also available under" that law:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the [ADA], [the Rehabilitation Act], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(l). This text raises a critical interpretive question: When does a suit under the ADA or Rehabilitation Act seek "relief" that the IDEA also makes "available"?

1

a. Our answer begins with the Supreme Court's decision in *Fry*. There, a student with cerebral palsy (E.F.) used her service dog (Wonder) to help with her balance while completing daily tasks like walking or taking off her coat. 137 S. Ct. at 751. E.F.'s parents asked her school's administrators to allow E.F. to bring Wonder to school. *Id.* at 750–51. E.F.'s parents sued after the administrators denied the request, alleging that their refusal to allow Wonder on school grounds violated the ADA and Rehabilitation Act. *Id.* at 751–52. Yet her parents failed to seek this accommodation through the IDEA. *Id.* Our court held that its exhaustion requirement barred their claims because the denial of the accommodation had caused educational harms to E.F. *Id.* at 758.

The Supreme Court disagreed with our rule requiring exhaustion whenever a student's injuries had an educational connection. *Id.* In the process, the Court issued two main holdings. *Id.* at 752–57. *Fry* first identified the "relief" that the IDEA makes "available" to students (in other words, the "benefit" that they may receive from a "favorable judgment"). *Id.* at 753 (citation omitted). The Court held that the IDEA allows parents to seek relief only for one injury: the denial of a "free appropriate public education." *Id.* at 753–55. The Court added that parents need not exhaust if they seek some other benefit that an IDEA hearing officer could not provide. *Id.* at 754.

*Fry* next clarified how courts should decide whether a lawsuit requests a "free appropriate public education," the IDEA's sole remedy. *Id.* at 755–57. Because the exhaustion provision focuses on the relief that parents *seek*, the Court adopted a complaint-centered approach. *Id.* at 755. It held that parents seek a free appropriate public education if the "crux" of their complaint requests that relief, notwithstanding "attempts at artful pleading" on their part. *Id.* at 755. Yet parents, as the "masters" of their complaint, must exhaust the IDEA's process only if they plead factual allegations that raise this remedy. *See id.* The parents need not exhaust if they seek other relief that the IDEA does not permit—even if they *could have* sought relief that it does. *See id.*

*Fry* provided three questions to guide this inquiry into whether a complaint seeks a "free appropriate public education" as the remedy. The Court started with a pair of hypotheticals: Could a student's parents have sought the relief if the challenged conduct had arisen outside school in, say, a "public theater or library"? *Id.* at 756. And could a teacher or guest at the school (rather than a student) have requested the same relief? *Id.* If the court answers "no" to these questions—for example, if a student with a learning disability seeks a tutor—the parents likely seek a free appropriate public education. *Id.* at 756–57. But if the court answers "yes"— for example, if a student in a wheelchair requests an access ramp—the student likely does not. *Id.* at 756. The Court ended with a third, real-world question: Were the parents using the IDEA's administrative process before they sued? *Id.* at 757. If so, their conduct would suggest that they themselves believed that they were seeking an education-related remedy available under the IDEA. *Id.*

How did *Fry*'s test play out for E.F.'s request to take Wonder to school? The Court opined that the Frys likely did not seek IDEA-available relief because they alleged "only disability-based discrimination" without requesting any educational changes. *Id.* at 758. Because E.F. needed Wonder's assistance for mobility reasons, the Court explained, she could have requested the accommodation at a library, and a teacher could have requested it at E.F.'s school. *Id.* Ultimately, though, the Court remanded the issue for the lower courts to consider whether the Frys had begun the IDEA's administrative process before they sued—an issue that the record left unclear. *Id.*

b. Although *Fry* directs us to ask whether a complaint seeks a "free appropriate public education" as the relief, it did not offer much input into what this term of art means. *Id.* at 754–55. The IDEA's text and circuit precedent both show what it requires: Parents seek "relief" that is "available" under the IDEA only if a child needs an *instructional change*, not just a *non-instructional accommodation* to some school rule or policy. 20 U.S.C. § 1415(l).

Begin with the text. The IDEA requires states to give only a certain benefit (a "free appropriate public education") only to certain students ("children with disabilities"). *Id.* § 1412(a)(1)(A). The law connects both phrases to *special education*. It defines "free appropriate public education" as "special education and related services" that, among other elements, "are provided in conformity with" a child's IEP. *Id.* § 1401(9)(D). It defines "child with a disability" as a child with certain impairments "who, by reason thereof, needs special education and related services." *Id.* § 1401(3)(A)(ii), (B)(ii). In other words, "free appropriate public education" is "special education," and a "child with a disability" is a student who "needs" that type of education.

The definition of "special education" next shows that a request for a "free appropriate public education" is a request for uniquely tailored teaching. "Special education" means "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability," including "instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and" "instruction in physical education." *Id.* § 1401(29)(A)–(B). To request a "free appropriate public education," then, parents must seek "instruction" that is "specially designed." *Id.* That is, they must seek relief about the "action of instructing or teaching" their child or the "imparting of knowledge or skill" to him or her. 7 *Oxford English Dictionary* 1049 (2d ed. 1989); *see also Webster's Third New International Dictionary of the English Language* 1172 (1986); *The American Heritage Dictionary of the English Language* 681 (1973). The requested teaching also must exceed "what is usual or customary," 16 *Oxford English Dictionary*, *supra*, at 153, and be "formed" "according to" an intended plan, 4 *Oxford English Dictionary*, *supra*, at 521; *see also Webster's Third*, *supra*, at 612, 2186. Or, as a regulation puts it, parents must seek a change to "the content, methodology, or delivery of" the

teaching "[t]o address the unique needs of [a] child" and "ensure access of the child to the general curriculum[.]" 34 C.F.R. § 300.39(b)(3).

To be sure, the IDEA also allows parents to seek "related services" as part of their child's "free appropriate public education." 20 U.S.C. § 1401(9). But the definition of "related services" confirms that a child must need teaching changes to receive the services. The phrase includes "transportation" and "developmental, corrective, and other supportive services" that "may be required to assist a child with a disability *to benefit from special education*." *Id.* § 1401(26)(A) (emphasis added). It thus expands the available relief to cover items "required" for a child to obtain specially designed instruction. *Id.* A school, for instance, might have to provide nursing care to a student who needs it to obtain the specially designed instruction. *See Cedar Rapids Cmty. Sch. Dist. v. Garret F.*, 526 U.S. 66, 73–75 (1999); *Irving Indep. Sch. Dist. v. Tatro*, 468 U.S. 883, 890–91 (1984). Or the school might have to provide a student in a wheelchair with "ramps" if the student needs them to receive that kind of instruction. 34 C.F.R. § 300.34(c)(16).

The IDEA, by contrast, does not allow parents to seek these services independent of specially designed instruction. Services cannot be "related" to special education (or "required" for a child to "benefit" from it) if the child does not need special education. 20 U.S.C. § 1401(26)(A). As a regulation explains, a child does not qualify for the IDEA's benefits if the child needs *only* noninstructional accommodations (like the wheelchair ramp). 34 C.F.R. § 300.8(a)(2)(i); *see also M.G. v. Williamson Cnty. Schs.*, 720 F. App'x 280, 286–87 (6th Cir. 2018); *Marshall Jt. Sch. Dist. No. 2. v. C.D.*, 616 F.3d 632, 641 (7th Cir. 2010). Yet the child might still qualify for relief under the ADA or Rehabilitation Act because those laws also cover children who need "regular" (not just "special") education. 34 C.F.R. § 104.33(b)(1); *cf. Fry*, 137 S. Ct. at 755–56.

Circuit cases on this exhaustion provision comport with this general rule that the IDEA requires instructional changes. Most obviously, courts require parents to exhaust their claims when they seek the "special education" at the IDEA's core. *See Durbrow v. Cobb Cnty. Sch. Dist.*, 887 F.3d 1182, 1190–91 (11th Cir. 2018) (citation omitted); *see also S.D. v. Haddon Heights Bd. of Educ.*, 722 F. App'x 119, 126 (3d Cir. 2018). Courts also require parents to

No. 22-5317                    *Doe v. Knox Cnty. Bd of Educ.*                    Page 11

exhaust their claims when they seek a change to the "delivery" or "methodology" of their child's "instruction[.]" 34 C.F.R. § 300.39(b)(3). Parents might seek a tutor or one-on-one aide. *See Wellman v. Butler Area Sch. Dist.*, 877 F.3d 125, 133 (3d Cir. 2017); *D.D. v. L.A. Unified Sch. Dist.*, 18 F.4th 1043, 1054 (9th Cir. 2021) (en banc); *Perez v. Sturgis Pub. Schs.*, 3 F.4th 236, 238–40 (6th Cir. 2021), *cert. granted*, 143 S. Ct. 81 (2022); *Heston ex rel. A.H. v. Austin Indep. Sch. Dist.*, 816 F. App'x 977, 981–82 (5th Cir. 2020) (per curiam). They might request that teachers "integrate" their child's "iPad into their lessons." *E.D. v. Palmyra R-I Sch. Dist.*, 911 F.3d 938, 939–41 (8th Cir. 2019). Or they might seek home or online schooling because their children's disabilities have left them homebound. *See L.G. v. Bd. of Educ. of Fayette Cnty.*, 775 F. App'x 227, 228, 231 (6th Cir. 2019); *Nelson ex rel. C.N. v. Charles City Cmty. Sch. Dist.*, 900 F.3d 587, 592–93 (8th Cir. 2018).

Conversely, courts generally hold that parents need not exhaust claims challenging noninstructional harms. When, for example, parents challenged a school's refusal to allow their child to bring his service dog to school, a court held that the parents did not need to exhaust because the claim did not request uniquely tailored teaching. *See Doucette v. Georgetown Pub. Schs.*, 936 F.3d 16, 24–27 (1st Cir. 2019). Similarly, when parents challenged a state law prohibiting schools from imposing mask mandates, a court held that they need not exhaust because a request for masks in schools was not a request for a teaching change. *See Arc of Iowa v. Reynolds*, 24 F.4th 1162, 1175–76 (8th Cir. 2022), *vacated as moot*, 33 F.4th 1042 (8th Cir. 2022) (per curiam); *but cf. E.T. v. Paxton*, 19 F.4th 760, 767 (5th Cir. 2021). And when parents challenged abuse that their child suffered in the classroom, courts have held that the parents need not exhaust because the abuse had nothing to do with the child's instruction. *See Doe v. Dallas Indep. Sch. Dist.*, 941 F.3d 224, 227–29 (5th Cir. 2019); *J.S. v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 986–87 (11th Cir. 2017) (per curiam); *cf. McIntyre v. Eugene Sch. Dist. 4J*, 976 F.3d 902, 914 (9th Cir. 2020).

2

Turning to this case, we begin with our standard of review. The district court expressed understandable uncertainty over whether the exhaustion provision imposed a jurisdictional limit (that the court had a duty to raise on its own) or a claims-processing rule (that a defendant could

forfeit). *Doe*, 2022 WL 1126389, at *2 n.2. Our court has left this question open, and others have split over it. *See L.G.*, 775 F. App'x at 231 n.3; *Muskrat v. Deer Creek Pub. Schs.*, 715 F.3d 775, 784 (10th Cir. 2013). We have healthy skepticism for those courts that view the exhaustion rule as jurisdictional. *Cf. Muskrat*, 715 F.3d at 783–85. Nothing in the text casts the rule in jurisdictional terms, *see* 20 U.S.C. § 1415(l), and courts usually treat exhaustion as an affirmative defense that a defendant must raise to preserve, *see Jones v. Bock*, 549 U.S. 199, 211–16 (2007).

Be that as it may, we can save this issue for another day. Since Knox County raised this argument, the distinction does not matter. *Cf. Gibson ex rel. Gibson v. Forest Hills Loc. Sch. Dist. Bd. of Educ.*, 655 F. App'x 423, 431 (6th Cir. 2016). If exhaustion amounts to an affirmative defense (triggering the motion-to-dismiss framework in Federal Rule of Civil Procedure 12(b)(6)), we must review the district court's dismissal de novo and accept the complaint's factual allegations. *Mattox*, 851 F.3d at 589–90. If exhaustion instead represents a jurisdictional limit (triggering the motion-to-dismiss framework in Rule 12(b)(1)), Knox County's motion raised a "facial" challenge. That type of motion also requires us to review the district court's dismissal de novo and treat the complaint's factual allegations as true. *See Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 535, 543–44; *Global Tech., Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*, 807 F.3d 806, 810 (6th Cir. 2016). Either way, our procedural rules remain the same.

Reviewing this exhaustion issue under those rules, we hold that Doe's parents did not need to proceed through the IDEA's administrative process because their complaint did not request (or suggest that Doe needed) any instructional changes. Recall that, according to the complaint, Doe's misophonia has forced her to leave her classes over 50% of the time because she cannot tolerate eating or chewing sounds. Compl., R.27, PageID 252, 256. To remedy this problem, Doe's parents ask for a single remedy: "a ban on eating and chewing in all of her *academic* classrooms (with a reasonable exception for other students with medical needs)." *Id.*, PageID 255.

The "crux" of this request is not a "free appropriate public education" as the IDEA defines that phrase. *Fry*, 137 S. Ct. at 755. A ban on eating and chewing is neither "special

education" nor a "related service" (the two items that make up a free appropriate public education).  20 U.S.C. § 1401(9).  No ordinary speaker would describe this ban as "specially designed instruction" (the key phrase in the "special education" definition) because there is nothing innately instructional about the ban.  *Id.* § 1401(29).  Doe's parents do not ask for a single change to the way that her teachers "impart[] . . . knowledge" to her.  7 *Oxford English Dictionary*, *supra*, at 1049.  And her teachers could offer identical "instruction" (the "action of" "teaching" her) with or without the ban.  *Id.*  Or, phrased in the language of the regulation, the ban would not change the "content, methodology, or delivery of [Doe's] instruction[.]"  34 C.F.R. § 300.39(b)(3).  Instead, the ordinary speaker would more naturally describe this ban as a change to the physical school environment—like, say, a request by a wheelchair-bound student for an automatic door opener to enter the classroom, a request by an allergic student for a peanut ban in the classroom, or a request by a diabetic student to use an insulin pump or glucose monitor there.  *Cf. CTL v. Ashland Sch. Dist.*, 743 F.3d 524, 525–26, 529 (7th Cir. 2014); *Barney v. Akron Bd. of Educ.*, 2017 WL 4226875, at *12 (N.D. Ohio Sep. 22, 2017), *aff'd* 763 F. App'x 528 (6th Cir. 2019).

If Doe otherwise required special education, we would find it debatable whether an accompanying ban on eating or chewing could qualify as one of the "related services" that the IDEA makes part of a "free appropriate public education."  20 U.S.C. § 1401(9); *cf. Cedar Rapids Cmty. Sch. Dist.*, 526 U.S. at 73–75.  On the one hand, the IDEA defines that phrase to include "supportive" services, 20 U.S.C. § 1401(26)(A), and a regulation suggests that such a service could include "[m]obilizing school and community resources to enable the child to learn as effectively as possible in his or her educational program," 34 C.F.R. § 300.34(c)(14)(iv).  On the other, one would not typically call a limit on eating and chewing a "service."  But our case does not rest on this interpretive question.  Doe's parents do not allege any facts suggesting that Doe "needs" *other* specially designed instruction.  20 U.S.C. § 1401(3)(A)(ii).  To the contrary, the complaint alleges that she excelled at her educational endeavors when the problematic sounds have not pervaded her classroom.  Compl., R.27, PageID 253–54.  And it alleges that she has no problem with the "content of the instruction" or the way that her teachers deliver it.  *Id.*, PageID 254.  Given these allegations, Doe does not request an eating and chewing

ban to gain access to "special education." 20 U.S.C. § 1401(26)(A). She requests it to gain access to regular education.

Apart from the IDEA's text, the relevant precedent points the same way. The requested accommodation in this case resembles the kinds of accommodations that courts have found fall outside the IDEA—like a request for a service dog to accompany a child in the classroom. *See Fry*, 137 S. Ct.at 758; *Doucette*, 936 F.3d at 24–26. The requested accommodation, by contrast, looks nothing like the kind of accommodations that courts have found fall within the IDEA—like a request for a one-on-one aide, *D.D.*, 18 F.4th at 1054, or for a teacher to integrate a child's iPad into the teacher's lesson plans, *E.D.*, 911 F.3d at 939–41.

*Fry*'s two hypothetical questions reinforce this conclusion. For one thing, Doe could have tried to seek this type of eating and chewing ban in many other places. If Doe sought to spend quiet time reading in her local library, her parents might have attempted to seek an eating-and chewing-free room. *Fry*, 137 S. Ct. at 756. Or if Doe sought to watch a classic Shakespeare play at the local theater, her parents might have attempted to seek a ban on eating or chewing during the performance. *See id.* Likewise, when Doe eventually enters the workforce, she might attempt to seek such a ban if she works in a cubicle-filled office. Indeed, employees with sensitivity to smells rather than sounds have regularly attempted to ban such things as perfume or scented candles in their workplaces under the ADA or Rehabilitation Act (albeit without much success). *See, e.g.*, *Milton v. Tex. Dept. of Crim. Just.*, 707 F.3d 570, 572–74 (5th Cir. 2013); *Robinson v. Morgan Stanley & Co.*, 269 F. App'x 603, 605–08 (7th Cir. 2008) (order); *Montenez-Denman v. Slater*, 2000 WL 263279, at *1–3 (6th Cir. Mar. 1, 2000) (per curiam).

For another thing, other people at L&N could have requested the same type of ban that Doe's parents seek in this case. *See Fry*, 137 S. Ct. at 756. Suppose the school's policy required all teachers to allow eating and chewing during class. A teacher with the same condition as Doe might attempt to seek an identical accommodation in order to teach effectively. *See id.*

*Fry*'s real-world question confirms that the gravamen of Doe's claim is not the denial of special education. *See id.* at 757. According to the complaint, Doe's parents have never sought (and Knox County has never proposed) an IEP for Doe under the IDEA. Compl., R.27, PageID

252.  Thus, even though the IDEA requires school districts to locate eligible children with disabilities, 20 U.S.C. § 1412(a)(3)(A), the complaint suggests that Knox County has determined that Doe falls outside this category.  The county instead has provided her with only a "504 plan" under the Rehabilitation Act.  *See* Compl., R.27, PageID 252.  The parties' prelitigation treatment of Doe as IDEA-ineligible bolsters her claim that she does not qualify.  *Fry*, 137 S. Ct. at 757.

Knox County responds that the denial of a free appropriate public education is the "crux" of the complaint because Doe's parents allege that the failure to impose an eating and chewing ban has caused Doe to suffer a "gap in learning" and "negatively affect[ed] [her] grades[.]"  Compl., R.27, PageID 258.  Invoking *Fry*'s hypotheticals, the county points out that a child could not allege that a theater caused this educational harm, and a teacher could not assert the harm at Doe's school.  This logic improperly reaches beyond the *challenged conduct* to the *resulting injury*.  By doing so, the county attempts to resuscitate our outdated approach asking whether a child's "injuries were, broadly speaking, 'educational' in nature."  137 S. Ct. at 758.  *Fry* rejected this approach, as evidenced by its discussion of the hypothetical "wheelchair-bound child" who sued under the ADA for "access ramps" at school.  *Id.* at 756, 758.  The Court explained that the lack of ramps likely would have "educational consequences" because a child who cannot get into school "cannot receive instruction there[.]"  *Id.* at 756.  Yet the Court listed this claim as the prototypical example of relief that does not require exhaustion.  *Id.*  It reasoned that the child's parents could have brought the same suit against a "library or theater" even if the lack of access ramps at those locations would cause different injuries.  *Id.*  Identical analysis applies here.

Knox County also compares this case to our decisions in *L.G.* and *Perez*, both of which applied the exhaustion provision to claims under the ADA or Rehabilitation Act.  But the parents in these cases requested instructional changes.  In *L.G.*, a student with E. coli could not attend school and, rather than offer the student home learning, the school charged his parents with truancy.  775 F. App'x at 228–29.  His parents alleged that the school had refused to assist with the student's "academic needs" and to provide "educational services" to him.  *Id.* at 231 (citation omitted).  They thus disputed its failure to provide instruction "in the home"—what anyone

No. 22-5317                    *Doe v. Knox Cnty. Bd of Educ.*                    Page 16

would call "specially designed instruction." 20 U.S.C. § 1401(29)(A). In *Perez*, a deaf student's parents alleged that the school had assigned him with an incompetent aide who did not know sign language. 3 F.4th at 238–39. They thus disputed the school's failure to deliver adequate instruction tailored to his inability to hear. *Id.* at 240–41; *cf.* 20 U.S.C. § 1414(d)(3)(B)(iv). (The Supreme Court has granted review in *Perez* to consider whether the exhaustion provision covers a damages claim and whether it contains a futility exception. *Perez v. Sturgis Pub. Schs.*, 143 S. Ct. 81 (2022). Our case does not implicate those issues.) Unlike the parents in *L.G.* and *Perez*, Doe's parents seek no instructional changes. They thus did not need to exhaust the IDEA's process.

### B. Preliminary Injunction under the ADA and Rehabilitation Act

Doe's parents next ask us to grant her a preliminary injunction requiring Knox County to implement her requested eating and chewing ban under the ADA or Rehabilitation Act. To evaluate this request, we must ask, among other questions, whether Doe's parents have shown that they will likely succeed on their claims. *See Sandison v. Mich. High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1030 (6th Cir. 1995). They argue that they will likely succeed because the ADA and Rehabilitation Act require schools to make "reasonable accommodations" for the disabled, and they describe their requested eating and chewing ban as "reasonable." But their cursory briefing on appeal falls well short of justifying a preliminary injunction at this time.

Consider their ADA claim. Title II provides: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Doe's parents do not argue that Knox County's neutral policy of giving teachers the power to allow students to eat in class engages in intentional "discrimination" against Doe. Unlike the ADA's other two titles, Title II also does not define the word "discriminate" to cover the refusal to make a reasonable modification to neutral policies on behalf of the disabled. *See Madej v. Maiden*, 951 F.3d 364, 372 (6th Cir. 2020); *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 750 & n.8 (7th Cir. 2006) (en banc).

No. 22-5317                    *Doe v. Knox Cnty. Bd of Educ.*                    Page 17

Nevertheless, the Attorney General has issued a regulation imposing this duty under Title II as well: "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(c)(7)(i). The key word in this regulation (modification) "connotes moderate" (not significant) change. *Sandison*, 64 F.3d at 1037 (quoting *MCI Telecomms. Corp. v. Am. Tel. & Telegraph Co.*, 512 U.S. 218, 228 (1994)).  So Doe's parents must show that a switch from a policy allowing food in the classroom to a policy prohibiting food qualifies as a moderate (rather than a significant) change in the relevant policy.  *See id.*  And they must confront the suggestion from L&N's principal that this change could require the college-like school to alter its "entire schedule" because it does not have a designated cafeteria.  Allen Decl., R.44-1, PageID 447; *cf. Davis v. Echo Valley Condo. Ass'n*, 945 F.3d 483, 491–92 (6th Cir. 2019).

Or consider their Rehabilitation Act claim.  It similarly provides: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]"  29 U.S.C. § 794(a).  The Supreme Court has likewise read this text to require governments sometimes to make "reasonable accommodations" to covered benefits programs to ensure that disabled individuals have "meaningful access" to them.  *Alexander v. Choate*, 469 U.S. 287, 301 (1985).  In the educational context, moreover, a regulation has interpreted this mandate to require "the provision of regular or special education and related aids and services" "designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met[.]"  34 C.F.R. § 104.33(b)(1)(i); *see CTL*, 743 F.3d at 529–30.  When a school has provided such aids and services to a disabled student, courts have held that parents must show not just that their *preferred* accommodation was reasonable but also that the *provided* accommodation was unreasonable.  *See Campbell ex rel. Campbell v. Bd. of Educ. of Centerline Sch. Dist.*, 58 F. App'x 162, 166 (6th Cir. 2003); *see also T.F. v. Fox Chapel Area Sch. Dist.*, 589 F. App'x 594, 599–600 (3d Cir. 2014).  This law suggests that Doe's parents would have to show that the § 504 plan that Knox County provided to her (including the allowance to wear

headphones and take breaks) was unreasonable, giving due regard to the "professional judgment" of school administrators.  *Campbell*, 58 F. App'x at 166–67 (citation omitted); *see also Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 436 (6th Cir. 1998) (quoting *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985)).

At day's end, we opt not to decide any interpretive issues about these two laws because the parties have not adequately briefed the merits.  Rather, we will simply deny the request of Doe's parents that we grant a preliminary injunction on appeal and remand for the district court to consider the merits in the first instance.  *Cf. Speech First, Inc. v. Schlissel*, 939 F.3d 756, 770 (6th Cir. 2019).  We reverse the dismissal of the complaint, deny the request that we issue a preliminary injunction on appeal, and remand for proceedings consistent with this opinion.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 22-5317

JANE DOE, a student, by her next friends and parents, K.M. and A.M.,

    Plaintiff - Appellant,

    v.

KNOX COUNTY BOARD OF EDUCATION,

    Defendant - Appellee.

```
┌─────────────────────────────────┐
│            FILED                │
│         Jan 04, 2023            │
│      DEBORAH S. HUNT, Clerk     │
└─────────────────────────────────┘
```

Before:  SUTTON, Chief Judge; DONALD and MURPHY, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's dismissal of the case is REVERSED and REMANDED for further proceedings consistent with the opinion of this court. IT IS FURTHER ORDERED that appellant's request for a preliminary injunction on appeal is DENIED.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk